ORIGINAL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------X

ROGER HELENESE,

A#079-107-718        PETITIONER,

V.

ERIC H. HOLDER,
UNITED STATES ATTORNEY GENERAL

RESPONDENT MATSUMOTO, J.

Civ. No:_____

PETITIONER FOR WRIT OF

HABEAS CORPUS PURSUANT TO
28 U.S.C. 2241, AND 28 USC 1651(a)
ALL WRIT ACT

CV 12 - 3167

RECEIVED
JUN 2 5 2012
PRO SE OFFICE

-----------------------------------------------------X

### PRELIMINARY STATEMENT

1. This is a petition for Writ of Habeas Corpus pursuant to 28 U.S.C. 2241, Petition of a
   Writ of Mandamus and Prohibition 8 USC 1651(a), All Writ Act to vacate the final order
   of deportation, compelling United States Embassy in Trinidad and Tobago to issue a
   visa and to compel United States Department of Homeland Security to readmit petitioner
   into the United States and grant permanent resident retroactive.

### STATEMENTS OF FACTS

2. The action was commences in Supreme Court, Queens County

3. The action was commenced on March 12, 2005 by the filing of a criminal charges in
   Criminal Court and later transferred to Supreme Court, County of Queens on the filing of
   the Indictment. On February 27, 2007, the Defendant/Appellant, ROGER HELENESE,
   was sentenced on the conviction of the charge of Unlawful Imprisonment in the First
   Degree, the sentence was a minimum of one year and a maximum of three years. On
   the convictions of the charge of Criminal Possession of a Weapon in the Third Degree,

1

PL 265.02(1) [Non-Violent Felony] the sentence was a minimum of two years and a maximum of six years. On the conviction of the charge of Criminal Possession of a Weapon in the Third Degree, PI 265.02 (4) [Violent Felony] the sentence was a determinate sentence of six years, all run concurrent.

4.  On March 12, 2005, the Defendant/Appellant, ROGER HELENESE was arrested without a warrant while staying in the RAMADA PLAZA HOTEL, based on a uncorroborated tip from an unknown informant named DAMIAN BEDWARD. The unknown informant named DAMIAN BEDWARD staed to the Police that the Defendant/Appellant, ROGER HELENESE was holding his girlfriend, KURLENE GRIFFITH by gun point and demanding Fifty-Thousand ($50,000.00) Dollars in ransom because of a drug deal that DAMIAN BEDWARD failed to complete. Without any independent corroboration of this information, Detective JOHN BRANDT went to the RAMADA PLAZA HOTEL, Room 476 and effected a warrantless upon hearing female conversation and what sounded like one female crying. Upon entering the room the Defendant/Appellant, ROGER HELENESE was arrested and charged with Kidnapping In The Third Degree, Criminal Possession of a Weapon In the Second Degree and other lesser included charges.

5.  Trial commenced on January 31, 2007 and concluded on February 8, 2007 when the Jury reached a verdict. The Defendant/Appellant, ROGER HELENESE was acquitted on the top charges of Kidnapping In the Second Degree and Criminal Possession of a Weapon in the Second Degree, but convicted on three lesser included charges of Unlawful Imprisonment in the First Degree, Criminal Possession of Weapon in the Third, PL 265.02 (1) [Non-Violent Felony] and Criminal Possession of Weapon in the Third, PL 265.02(4) [Violent Felony].

2

6.  On February 27, 2007, the Defendant/Appellant, ROGER HELENESE was sentenced on the conviction of the charge of Unlawful Imprisonment in the First Degree, the sentence was a minimum of one year and a maximum of three years. On the conviction of the charge of Criminal Possession of a Weapon in the Third Degree, PL 265.02 (1) [Non-Violent Felony] the sentence was a minimum of two years and a maximum of six years. On the conviction of the charge of Criminal Possession of a Weapon in the Third Degree, PL 265.02(4) [Violent Felony] the sentence was a determinate sentence of six years, all to run concurrent. At Trial, DETECTIVE, GREGORY DISCOSTANZA testified that he tested the gun, but not the ammunition that was recovered with the gun. Hat he used ammunition from his supply chest and not the bullets taken from the gun.

7.  Petitioner was ordered deported on April 22, 2010. U.S. Department of Justice Executive Office for Immigration Review, Board of Immigration Appeals affirmed the Immigration Judge's decisions on August 24, 2010. United States Court of Appeals for The Second Circuit denied a petition for review on May 15, 2012.

## JURISDICTION

8.   The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No.104-208, 110 Stat. 1570, amended the INA to severely restrict the scope of judicial review of final orders of removal and other executive actions incident to the removal process.

9.  For example, INA 242(a)(1), 8 U.S.C. 1252(a)(1), generally provides for judicial review of final orders of removal in the Court of Appeals; however, "no court shall have jurisdiction to review a final order of removal against an alien who is removable by reason of having committed [an aggravated felony]." INA 242(a)(2)(C).

10. Section 242(b)(9) provides that "judicial review of all questions of law and fact, including interpretation and application and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of final order under this section."

11. Additinally, in the context of detention pending removal proceeding, INA 236(e) states: "The Attorney General's discretionary judgment regarding the applicability of [236] shall not be subject to review.

12. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole."

13. 242(g) of the INA, 8 U.S.C. 1252(g), does not divest this court of its jurisdiction to review Petitioner's mandatory detention under 8 U.S.C. 1226(c), declaration of UNITED STATES NATIONAL and award of a Certification of Naturalization.

## VENUE

14. Venue lies in the United States District Court for the Eastern District of New York in view of the facts that under the United States Court of Appeals for the Second Circuit case law and precedent, it is the forum where the petition resided prior to his incarceration or detention and not the forum where he is detained that has venue. Diversity of Citizenship is complete and the United States District Court for the Western District of New York is forum non convenience. Petitioner is exercising his right to invoke forum of choice because Queens and Kings County, New York is where the evidence and witnesses needed in support of his application for relief are located.

4

## LEGAL ISSUES

### DEPORTATION, DETENTION AND RELIEF

15. As a matter of law, the clear purpose of Section 1226(c)(1) is to authorize the mandatory detention of immigrant who committed offenses enumerated within section 1226(c)(1)(A)-(D), immediately upon their release from criminal sentence under parole supervise release probation compare with Garcia v. Shanahan 615 F.Supp 2d 175, 182 (SDNY 2000) "holding the plain language of the statute manifest congress clear intent that there must be a nexus between the date of release and removable offense. See Saysana v. Gillen 590 F.3d 510 (CA1 2009), (if the reference to "when the alien is release is ready to encompass any release from any non-DHS custodial settings... that phrase is completely disjoined from the text that proceeds and follows it"). See Matter Rojas 23 I&N Dec 117 (BIA 2001) which is wrong as a matter of law and contrary to the plain language of the statute. See Scarlett v. DHS 632 F. Supp 2d 214, 219 (WDNY 2009).

16. ICE has authority to detain any alien pending a decision in removal proceedings, and has discretion to release some aliens. INA Section236(a), 8 U.S.C. Section 1226(a). Aliens who have convicted of certain enumerated offenses, however, including drug crimes, see id 1226(c)(1)(B), 1227(a)(2)(B), are subject to mandatory detention under INS Section 236 (c), which provides:

   (c) Detention of criminals aliens

   (1) The Attorney General shall take into custody any alien who-...(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C) or (D) of this title... when the alien is released, without regard to whether the alien is

5

released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense. 8 U.S.C. Section 1226 (c)(1). The Attorney General has discretion to release such aliens from detention only in limited circumstances, not applicable here, upon a determination that release is necessary to protect a witness in a criminal matter. Id Section 1226(c)(2).

17. Congress enacted this provision pursuant to section 303(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Div. C, Pub. L. No. 104-208, Section 303(b), 110 Sta. 3009-586 (Sept. 30, 1996), in response to evidence that the INS (now ICE) was unable to remove the majority of criminal aliens, in large part because of their failure to appear for removal hearings, and that such aliens displayed a high rate of recidivism. See Demore v. Kim, 538 U.S. 510,518-19, 123 S.Ct. 1708, 155 L. Ed. 2d 724 (2003). Congress deferred the rules implementation for two years, directing the new INA Section 236 (c) provisions "shall apply to individuals released after such periods." IIRIRA Section 303(b)(2),

18. Matter of Rojas, however, is wrong as a matter of law and contrary to the plain language of the statute. The clear purpose of Section 1226(c)(1) is to authorize the mandatory detention of immigrants which who have committed offenses enumerated within section 1226 (c)(1)(A)-(D) immediately upon their release from criminal sentences for those same offenses, even if they are still serving part of the sentence out in the community under "parole, supervised release, or probation.

19. A majority of courts that have examined this issue have held that the mandatory statute is unambiguous on this point. See, e.g., Monestime, 704 F. Supp 2d at 458 (citing Garcia, 615 F. Supp 2d at 180-81); Burns v. Cicchi, 702 F. Supp 2dm 281, 288 (D.N.J. 2010) (holding that "Congress clearly intended to limit the "when released" language to those offenses and grounds for inadmissibility set forth in section 1226(c)(1)(C)"); Scarlett v. DHS 632 F. Supp. 2d 214, 219

6

(WDNY 2009) (agreeing with the district courts that have held the statute do not apply when the alien was not taken into immigration custody at the time of his release from incarceration on the underlying criminal charges"); Waffi v. Loiselle, 527 F. Supp 2d 480, 488 ( E.S. Va 2007) (holding that "the mandatory detention statute...does apply to an alien...who has been taken into immigration custody well over a month after his release from state custody" for an offense enumerated within 236(c)); Bracamontes v. Desanti, 2010 U.S>Dist. Lexis 75958, 2001 WL 2942760 at *5 (E.D. Va. June 16, 2010) (collecting cases).

20. In Matter of Rojas 23 I&N Dec 117 (BIA 2001), the BIA explained that the mandatory detention provision of Section 236(c)(1) of the act is implicated by the post TPCR release from DHS custody even if the alien is not immediately taken into custody by DHS. In the Matter of Saysana 24 I&N Dec. 600 (BIA 2008), the Board of Immigration Appeals also held that section 236 (c)(1) of the act does not support the limiting of the non-DHS custodial setting to post TPCR criminal custody tied to the offense enumerated in the statutes quoted. In the Matter of Luis Felipe Garcia 25 I&N Dec. 267 (BIA 2010), (alteration in the original) [emphasis added].

21. However the BIA has retreated from the Matter of Saysana and further modified its decision in the Matter of Adeniji and now hold that Section 236(c) of the act requires mandatory detention of the criminal alien only if he is release from non-DHS custody after the expiration of the TPCR and only where there has been a post TPCR release that is directly tied to the bases of detention under Section 236(c)(1)(A)-(D) of the act. See 2 C.F.R. Section 1003, 19(h)(2)(i)(D) (2001). Citing in the Matter Garcia 25 I&N Dec. 267 (BIA 2010).

22. At the heart of this case lies the Board of Immigration Appeals' ("BIA'S") Decision in In re Joseph, 22 I&N Dec. 799 (BIA 1999), a decision that is both contrary to the Constitution and shortsighted as a mater of policy, Joseph concerned the proper scope of 236(c) of Immigration and Nationality Act ("INA"), 8 U.S.C. 1226 (c), commonly known as the INA's "mandatory

detention" provision. Section 236 (c) directs the Attorney General to take into custody certain aliens who are facing deportation and prohibits their release under all but the narrowest of circumstances. As with the most statutes, the relatively simple mandatory of 236(c) leaves many questions unanswered, the most important of which is who, exactly, falls under the statute's provisions. The statute states only that mandatory detention applies to an alien who "is deportable by reason of having committed" a number of specified criminal offenses, but does not define those offenses with precision, nor does it define what "is deportable" means.

23. The implementing regulations also do little to help; they provide an alien with the opportunity to establish that he is "not properly included" in the statute's reach, but they say nothing about what, precisely, that alien must show. See 8 C.F.R. 1003.19 (2005). In Joseph, the BIA finally gave a meaningful answer to this question. The BIA concluded that the initial determination by the Bureau of Immigration and Customs Enforcement ("BICE") that a alien fell within the reach of section 236 (c) was entitled to a great deal of deference. Joseph, 22 I&N Dec. at 800. Thus, the BIA held that an alien who wishes to avoid the reach of section 236(c) was required to show that BICE was "substantially unlikely to establish" the charges that rendered the alien subject to mandatory detention. Id. At 806.

24. The BIA's Joseph decision was, plainly put, wrong. There can be no doubt that individual liberty is one of the most fundamental rights protected by the Constitution. See Zadvydas v. Davis, 533 U.S. 678, 690, 121 S.Ct. 2491, 150 L. Ed. 2d 653 (2001) ("Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty [the Due Process] Clause protects."). Joseph, which was decided prior to Zadvydas, gives that right little or no weight. Instead, it establishes a system of "detention by default" by placing the burden fully on the alien to prove that he should not be detained. When such a fundamental right is at stake, however, the Supreme Court has insisted on heightened

8

28. Thus, the Court concluded that "due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." Id. at 427. Since Addington the Supreme Court has repeatedly reaffirmed the principle that "due process places a heighten burden of proof on the state in civil proceedings in which the "individual interest at stake…are both particularly important and more substantial than mere loss of money." Cooper v. Oklahoma, 517 U.S. 348, 363, 116 S.Ct. 1373, 134 L. Ed. 2d 498 (1996) (quoting Santosky v. Kramer, 455 U.S. 745, 756, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (internal quotation marks omitted).

29. In Santosky, for example, the Court considered a New York law that allowed the state to terminate parental rights upon proof of "permanent neglect" by a preponderance of the evidence. 455 U.S. at 747. Because the statute directly affected the "fundamental liberty interest of natural parents in the care, custody, and management of their child," id. at 753, the Court held that it needed to include greater procedural protection than the preponderance of the evidence standard. Id. at 769-70.

30. Again in Foucha v. Louisiana , 504 U.S. 71, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992), the Court found a statute unconstitutional that placed on civilly committed individuals he burden of proving that that they were not a danger to the public before allowing their release. Id. at 73, 83. Noting that "in our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception, "the court held that such a system failed adequately to protect the individual's liberty interest. Id. at. 83 (quoting United States v. Salerno, 481U.S. 739, 755, 107 S.Ct. 2095, 95 L. Ed. 2d 697 (1987)). Once again, because "freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause," clear and convincing evidence was needed to civilly commit the individual. Id. at 80.

10

procedural protections to guard against the erroneous deprivation of that right. In particular, the Supreme Court has time and again rejected laws hat place on the individual the burden of protecting his or her fundamental rights.

25. The first of these decisions is Addington v. Texas, 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979), in which the Court vacated the Texas Supreme Court's ruling that a person could be civilly committed based upon a finding of mental illness by a preponderance of the evidence. Id. at 432-33. In reaching its conclusion, the Court elaborated upon the "function of a standard of proof, as that concept is embodied in the Due Process Clause." Id. at 423. According to the Court, its primary function was to allocate the risk of an erroneous decision among litigants based upon the competing rights and interests involved. Id.

26. Thus, in a civil case, because the interests involved are minor and because "society has a minimal concern with the outcome," the litigants share the risk of error roughly equally under the preponderance of the evidence standard. Id. In a criminal case, on the other hand, "the interests of the defendant are of such magnitude" that "our society imposes almost the entire risk of error upon itself" by insisting on the beyond a reasonable doubt standard. Id. at 423-24. Based on these principles, the Court held that the Constitution required a showing of mental illness by at least clear and convincing evidence before an individual's liberty could be constrained. Id. at 432-33.

27. Noting that it "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," Id. at 425, the Court found it improper to ask "the individual... to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state," id. at 427.

31. Finally in Cooper, the Court unanimously rejected a state-law presumption that a defendant was competent to stand trial unless that defendant established his incompetence by clear and convincing evidence. 517 U.S. at 350, 355-56. Stating that "we received no sound basis for allocating to the criminal defendant the large share of the risk which accompanies a clear and convincing evidence standard, " the Court held that the Oklahoma law violated due process. Id. at 366.

32. As the above case illustrate, the Supreme Court has consistently adhered to the principle that the risk of erroneous deprivation of a fundamental right may not be placed on the individual. Rather, when a fundamental right, such as individual liberty is at stake the government must bear the lion's share of the burden. Indeed, those cases in which the Court has found detention schemes to be permissible have emphasized the procedures available to protect the individual's rights. For example, in Salerno, the Supreme Court upheld the Bail Reform Act, which allowed the government to detain an arrestee pending trial upon a showing by the government that "no release conditions will reasonably assure...the safety of any other person and the community." 481 U.S. at 741 (quoting Bail Reform Act of 1984, 18 U.S.C. 3142).

33. In upholding the Act, the Court emphasized how narrowly crafted it was, citing the "stringent time limitations" placed on pretrial detention, id. at 747, [430 F.3d 1246] its spplicability only to the "most serious of crimes," id., its requirement of proof of dangerousness by clear and convincing evidence, id. at 750, and its judicial safeguards, id. at 751-52.

34. Both the blanket application of the Joseph standard and the breath of its reach stand in stark contrast to the narrowly tailored design of the Bail reform Act. Cf. Foucha, 504 U.S. at 81 ("Unlike the sharply focused scheme at issue in Salerno, the Louisiana scheme of confinement is not carefully limited."); Zadydas, 533 U.S. at 692 (expressing skepticism about detention

11

where the "sole procedural protections available to the alien are found in administrative proceeding, where the alien bears the burden of proving he is not dangerous").

35. In light of the above cases, the Joseph standard is not just unconstitutional, it is egregiously so. The standard not only places the burden on the defendant to prove that he should not be physically detained, it makes that burden all but insurmountable. Unlike Addington and its progeny, the Joseph standard places little to no risk on the broad shoulders of the government.

36. In light of the due process concerns described above, this court should reject the Joseph standard. Instead, it should interpret section 236(c) to apply mandatory detention in a more narrow fashion. Only those immigrants who could not raise a "substantial" argument against their removability should be subject to mandatory detention. See Demore, 538 U.S. at 578-79 (Breyer, J., dissenting). This interpretation is not only more respectful of the Constitution, it is also more consistent with congress chosen language. Id. at 578 ("Title 8 U.S.C. 1226(c) tells the Attorney General to take into custody any alien who...is deportable. (emphasis added), not one who may, or may not, fall into that category.").

37. The "substantial argument" standard strikes the best balance between an alien's liberty interest and the government's interest in regulating immigration. See Demore, 538 U.S. at 578 (Breyer, J., dissenting) (the 'substantial question of law or fact" standard "gives considerable weight to any special governmental interest in detention, " is "more protective of a detained alien's liberty interest than those currently administered in the INS Joseph hearings," and has "proved workable in practice in the criminal justice system"). It gives the alien's liberty rights adequate respect and ensures that the alien's detention will be relatively brief. At the same time, it provides the government leeway to detain those aliens who lack any incentive to press their legal claims, and are therefore the most likely to abandon those claims and flee.

12

## CATEGORY APPROACH OF AGGREVATED FELONY

38. In determining whether petitioner's conviction falls within the ambit of section16, the court is required to focus on the "offense" of conviction. See 16(a) (defining a crime of violence as "an offense that has as an element the use...of physical force against the person or property of another" (emphasis added); 16(b) (defining the term as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (emphasis added)). This language requires the court to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime.

39. In Leocal v. Ashcroft, Florida Stat. section 316. 193(3)(c)(2) makes it a third-degree felony for a person to operate a vehicle while under the influence and, "by reason of such operation, caus[e] ... [s]erious bodily injury to another." The Florida statutes, while it requires proof of causation of injury, does not require proof of any particular mental state. See State v. Hubbard, 751 So. 2d 552, 562-564 (Fla. 1999) (holding, in the context of a DUI manslaughter conviction under 316. 193, that the statute does not contain a mens rea requirement).

40. Many states have enacted similar statutes, criminalizing DUI causing serious bodily injury or death without requiring proof of any mental state, or, in some states, appearing to id 125 S. Ct. 382 require only proof that the person acted negligently in operating the vehicle. The question here is whether section 16 can be interpreted to include such offense.

41. In this instant case ICE erred in categorizing Roger Helenese conviction as an aggravated felony. The ICE's determination in this instant case that a given violation of a state or federal criminal statute constitutes an aggravated felony presents a pure question of law.

13

42. The INA provides that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. 1227(a)(2)(A)(iii). The act give substance to the term "aggravated felony" by setting out a list of enumerated offenses that come within its scope. See id. section 1101(a)(43). This compendium includes "an[y] offense that involves driving while intoxicated. The government bears the burden of proving removability by clear and convincing evidence, and by extension, must carry the devoir of persuasion as to an alien's conviction for an aggravated felony.

43. The INA does not prescribe detailed methodology for determining whether a predicate offense fits within these definitions (and, thus, qualifies as an aggravated felony). Where uncertainty exists, however, virtually every court of appeals faced with the question has sought some form of guidance from the category approach devised by the Supreme Court for use in the criminal sentencing context. See Emile v. INS, 244 F.3d 183, 167 & n. 3 (1st Cir. 2001) (collecting cases).

44. The BIA has followed suit, citing the leading Supreme Court precedent, Taylor v. United States, 495 U.S. 575, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990), in a number of aggravated felony decisions. See e.g., Matter of Alcantar, {461 F. F.3d 53} 20 I&N Dec. 801, 811 (BIA 1994). The BIA applied what it deemed "modified category approach" in the instant case.

45. Taylor involved the constitution of a section of the Armed Career Criminal Act (ACCA), 18 U.S.C> 924(e), 495 U.S. at 599-602. That section prescribe a mandatory minimum sentence with respect to any conviction for possession of a firearm by a defendant having a minimum of three prior convictions for "violent felon[ies] or serious drug offense[s]." 18 U.S.C. 924(e)(1). In a manner reminiscent of the INA's treatment of aggravated felonies , the ACCA defines "violent felony," in part, by reference to a list of exemplary offenses. See id.924(e)(2)(B)(ii).

14

46. ICE made an error by determining that respondents prior underlying conviction subsumes a violent felony and thus (a predicate offense for ACCA purposes), the Supreme Court devised a categorical approach. See Taylor, 495 U.S. at 600. This categorical approach consist of two steps. See id. at 602. Where a violation of the statute underlying the prior conviction necessarily involves every element of an offense listed in section 924(e)(2)(B)(ii), the mere fact of conviction establishes that the putative predicate was a violent felony. Id.

47. Where, however, the underlying statute spans, but is broader than, the listed offense (i.e., where it encompasses some conduct that would constitute a violent felony and some conduct that would not), the putative predicate offense qualifies as a violent felony only "where a jury was actual required to find all the elements" of the listed offense. Id. In that circumstance, a sentencing court charged with determining what the jury actually was required to find cannot retry the original case but, rather, must restrict its inquiry to the record of the conviction, including the charging document and jury instruction. See id.

48. The court later extended the categorical approach to cases in which the prior conviction results from a guilty plea rather then from a jury verdict. See Shepard v. United Staes, 544 U.S. 13, 19-20, 125 S.Ct. 1254, 161 L. Ed. 205 (2005). In rejecting the government's contention that a sentencing court could rest its characterization of the putative predicate offense on facts contained in a police report, the Justices reiterated that the appropriate inquiry is "confined to records of the convicting court." Id. at 23.

49. The inquiry thus include "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Id. at 16. In other words, a sentencing court may conclude that a guilty plea subsumed a violent felony only when the record of conviction makes manifest that the

15

defendant's plea necessarily constitutes an admission to every element of a listed offense. See id. at 26.

50. The United States Court of Appeals for the Eleventh Circuit including the District of Columbia have previously introduced the Taylor-Shepard categorical approach into an immigration-related context. Under the federal sentencing guidelines, a prior conviction for an offense designated as an aggravated felony in 8 U.S.C. 1101(a)(43) may trigger an upward enhancement in the total offense level referable to certain immigration-related offenses, including illegal reentry after deportable. See USSG 2L1.2(b)(1)(C). The circuit courts have also held that the Taylor-Shepard categorical approach governs the determination of whether an alien's prior offense qualifies as an aggravated felony for this purpose.

51. The BIA, and various courts of appeals, also have imported versions of the categorical approach into removal jurisprudence. There is, however, no universally accepted definition of what constitutes a "modified categorical approach for immigratin-law purposes. The Ninth Circuit uses that locution to refer to the second step of the Taylor analysis and the locution "categorical approach" to refer to the first step. See Li v. Ashcroft, 389 F.3d 892, 895-96 (9th Cir. 2004).

52. Other courts, and the BIA, have referred to the two-step Taylor rubric by the unitary term "categorical approach." See, e.g., Singh v. Ashcroft, 383 F.3d 144, 152-53 (3d Cir. 2004); Dickson v. Ashcroft, 346 F.3d 44,48-49 (2d Cir. 2003); In re Vargas-Sarmiento, 23 I&N Dec. 651, 652-54 (BIA 2004); In Sweetser, 22 I&N Dec. 709, 715 (BIA 1999; Matter of Alcantar, 20 I&N Dec. at 812-113. A modified categorical approach would, under these authorities, be some variant of the Taylor two-sap.

53. This is not merely an exercise in semantics. This Ninth Circuit praxis means that it in effect uses an unmodified categorical approach in immigration cases. See, e.g., Li, 389 F.3d at 895-97

16

& n.7 (holding that a conviction resulting from a guilty verdict subsumes an aggravated felony for immigration purposes only when the record of conviction establishes that the jury was required to find all the elements of an offense enumerated in 8 U.S.C. 1101(a)(43)).

54. In Chang v. Ins, 307 F.3d 1185, 1190-91 (9th Cir. 2002) the Ninth Circuit held that when a conviction result from a guilty plea, the putative predicate crime constitutes an aggravated felony only if the record of conviction establishes that the defendant necessarily pleaded guilty to each and every element of an offense enumerated in 8 U.S.C. 1101(a)(43)). In that court's view, this praxis comports with the statutory requirement that the alien have been convicted of an aggravated felony.

55. Congress first made commission of an aggravated felony grounds for an alien's removal in 1988, and it defined the term to include offense such as murder, drug trafficking crimes, and firearm trafficking offenses. See Ant-Drug Abuse Act of 1988, 7342, 7344, 102 Stat. 4469, 4470.

56. Since then, Congress has frequently amended the definition of aggravated felony, broadening the scope of offenses which render an alien deportable. See, e.g., Antiterrorism and Effective Death Penalty Act of 1996, 440(e), 110 Stat. 1277 (adding a number of offenses to 101(a)(43) of the INA); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 321, 110 Stat. 3009-627 (same). The inclusion of any "crime of violence" as an aggravated felony came in 1990. See immigration Act of 1990, 501, 104 Stat 5048.

57. ICE position is that Roger Helenese case is counted as a crime of violence under 18 U.S.C. 16 compare with Matter of Puente-Salazar, 22 I&N Dec. 1006, 1012-1013 (BIA 1999) (en banc) United States v. Trinidad-Aquino, 259 F. 3d 1140, 1145-1146 (CA9 2001); Dalton v. Ashcroft, 257 F. 3d 200, 205-06 (CA2 2001); Bazon-Reyes v. INS, 256 F. 3d 600, 609-611 (CA7 2001);

17

and United States v. Chapa-Garza, 242 F. 3d 921, 926-927 (CA5, amended, 262 F. 3d 479 (CA5 2001) (per curiam); see also Ursu v. INS, 20 Fed. Appx. 702 (CA9 2001).

58. The BIA in another case reversed its position from Puente-Salazar and held that DUI offenses that do not have a mens rea of at least recklessness are not crimes of violence within the meaning of section 16. See Matter of Ramos, 23 I. & N. Dec. 336, 346 (BIA 2002) (en banc). However, because the BIA held in Ramos that it would "follow the law of the circuit in those circuits that have addressed the question whether driving under the influence is a crime of violence," id., at 346-347. In Leocal v. Ashcroft the Eleventh Circuit relied upon its decision in Le v. United States Attorney General (per curiam) in ruling that Le is controlling in affirming the IJ's removal order in Leocal.

59. For instance, a number of statutes criminalize conduct that has as an element the commission of a crime of violence under section 16. See, e.g., 18 U.S.C. 842(p) [18 USCS 842 (p)] (prohibiting the distribution of information relating to explosive, destructive devices, and weapons of mass destruction in relation to a crime of violence). Other statutory provisions make classification of an offense as a crime of violence consequential for purposes of inter alia, extradition and restitution. See 3181(b), 3663A(c). And the term "crime of violence" under 16 has been incorporated into a number of noncriminal enactments. See, e.g., 8 U.S.C. 1227(a)(209a09iii0 [8 USCS 1227(a)(2)(A)(iii)] (rendering an alien deportable for committing a crime of violence as petitioner is charged here).

60. Thus, 16(b) plainly does not encompass all offenses which create a "substantial risk" that injury will result from a person's conduct. The "substantial risk" in 16(b) relates to the use of force, not to the possible effect of a person's conduct. Compare 16(b) (requiring a "substantial risk that physical force against the person or property of another may be used") with the United States Sentencing Commission, Guidelines Manual section 4B1.2(a)(2) (Nov. 2003) ( in the

18

context of a career-offender sentencing enhancement, defining "crime of violence" as meaning, inter alia, "conduct that presents a serious potential risk of physical injury to another").

61. Even if 16 lacked clarity on this point, EOIR would be constrain to interpret any ambiguity in the statute in petitioner's favor. Although the Courts and the BIA have dealt with 16 in the deportation context, 16 is a criminal statute, and it has both criminal and noncriminal applications. Because the court must interpret the statute consistently, whether the courts encounter its application in a criminal or noncriminal context, the rule of lenity applies. Cf. United States v. Thompson/Center Arms Co., 504 U.S. 505, 517-518, 119 L. Ed. 2d 308, 112 S. Ct. 2102 (1992) (plurality opinion) (applying the rule of lenity to a tax statute, in a civil setting, because the statute had criminal applications and thus had to be interpreted consistently with its criminal applications).

62. This point carries significant weight in the particular context of this case. Congress incorporated 16 as an aggravated felony under 101(a)(43)(F) of the INA in 1990. See Immigration Act of 1990, 501, 104 Stat. 5048 (Nov. 29, 1990). Congress enacted 101(h), with its incorporation of 16 and a separate provision covering DUI-causing injury offenses, just nine months earlier. See FRAA, 131, 104 Stat. 31 (Feb. 16, 1990). That Congress distinguished between a crime of violence and DUI-causing-injury offenses (and included both) in 101(h), but did not do so shortly thereafter in making only a crime of violence an aggravated felony under 101(a)(43)(F), strongly supports our construction of 16.

63. First, the rationale of Shepard and Taylor is informed by constitutional concerns. See Shepard, 544 U.S. at 24; Taylor, 495 U.S. at 601. Those concerns, which emanate from the Sixth Amendment, are crucial in the criminal context but entirely irrelevant in the removal context (which is civil in nature). See INS v. Lopez-Mendoza, 468 U.S. 1032, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984) (stating that "various protections that apply in the context of a criminal

19

trial do not apply in a deportation proceeding" due to the civil nature of deportation); United States v. L.O. Ward, 448 U,S, 242, 248, 100 S. Ct. 2636, 65 L. Ed. 2d 742 (1980) (holding that Sixth Amendment protections are available only in criminal proceedings). Consequently, the Taylor-Shepard rationale cannot be applied woodenly to removal cases.

64. Although the BIA has cited Taylor in some aggravated felony cases, see e.g., Matter of Alcantar, 20 I&N Dec. at 812, it traditionally has favored a less restrictive form of the categorical approach in cases other than those controlled by Ninth Circuit precedent, see, e.g., Vargas-Sarmiento, 23 I&N Dec. at 654-55; In re Pichardo-Sufren, 21 I&N Dec. 330, 333-36 (BIA 1996). And the United States Court of Appeals for the First Circuit indicated that the BIA's partial reliance on conduct described in a charged but continued count from the criminal proceeding).

65. Last – but far from least – using an unmodified categorical approach impermissibly elevates the government's burden in civil removal proceedings. The INA requires clear and convincing evidence of removability, see 8 U.S.C. 1229a(c)(3)(A), but the unmodified categorical approach in effect requires proof beyond a reasonable doubt.

## 28 USC 2241 HABEAS CORPUS

66. Petitioner urges the court to begin its jurisdictional analysis with the understanding that an implied repeal of the habeas jurisdiction of federal courts are disfavored. Ex parte Yerger, 75 U.S. (8 Wall), 85, 102, 105, 19 L.Ed. 332 (1968).

67. In Felker v. Turpin, the Supreme Court applied Yerger and held that a portion of Title I of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. 2244(b)(3)(E), which prevents the Supreme Court from reviewing, by appeal or writ of certiorari, an order from the court of appeals denying a state habeas petitioner leave to file a second or successive

habeas petition, did not prevent it from exercising jurisdiction original habeas petitions. 518 U.S. 651, 660-61, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996).

68. In determining that 2244(b)(3)(E) did not deprive it of original habeas jurisdiction, the Supreme Court notes that Title I of the AEDPA lacked any reference to its authority to entertain, as an original matter, petitioner for a writ of habeas corpus. Id. at 661 ("Although 2244(b)(3)(E) precludes [the Supreme Court] from reviewing, by appeal or petition for certiorari, a judgment of conviction application for leave to file a second habeas petition in district court, it makes no mention of [the Supreme Court's] authority to hear habeas petitions filed as original matters in ["the Supreme Court"]. Accordingly, the Court declined, as it did so in Yerger with respect to a predecessor to 28 U.S.C. 2241, to effect a repeal "by implication" of its jurisdiction under 28 U.S.C. 2241. Id.

69. In Immigration & Naturalization Serv. V. St. Cry, the Supreme Court reaffirmed the role that a writ of habeas corpus has played in the review of the legality of executive detention. 533 U.S. 289, 305; 121 S. Ct. 2271; 150 L. Ed. 2d 347 (2001) (citing Felker, 518 U.S. at 663; 116 S. Ct. 2333; 135 L. Ed. 2d 827; Swain v. Pressley, 430 U.S. 372; 380 n. 13, 97 S. Ct. 1224; 51 L. Ed 411 (1977; id. at 385-86 ( Burger, CJ., concurring)).

70. In considering a jurisdictional challenge based on provision of the AEDPA and the IIRIRA to the district court power to entertain petitioner's habeas claims, the Supreme Court noted that the respondent was required to overcome both the strong presumption in favor of judicial review of administrative action and the long standing rule requiring a clear statement of congressional intent to repeal habeas jurisdiction. Id. at 298 (emphasis added). Implication from statutory text or legislative history, the Court noted, "are not sufficient to repeal habeas jurisdiction," and "Congress must [instead] articulate specific and unambiguous statutory directives to effect a repeal." Id. at 299 (citing Yerger, 8 Wall at 105). Upon review of the relevant provisions, the

21

Court conclude that the "lack of a clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas" meant that habeas jurisdiction under 2241 was not repealed by the AEDPA and the IIRIRA. Id. at 314.

71. In its recent decision in Demore v. King, the Supreme Court held that it has habeas jurisdiction over claims involving challenges o detention under section,236(c) of the INA. 538 U.S. 510, 517; 123 S. Ct. 1708, 155 L. ed. 2d 724 (2003)(noting that constitutional challenges to section 236(c) of the INA are not barred by section 236(e), as the latter subsection contains "no explicit provision barring habeas review.

72. The Court reaffirmed its requirement for a "particularly clear" statement of Congress intent "where a provision precluding review is claimed to bar habeas review[.]" Id. Although the petitioner in Demore raised solely a due process challenge to his detention during removal proceedings, it is well established that district courts also retain jurisdiction to consider an alien's habeas challenge to the statutory framework mandating his detention during removal proceedings. 28 U.S.C. 2241(c)(3) (nothing that the writ of habeas corpus may extend to those held in custody in violation of the Constitution "or laws or treaties of the United States").

73. Section 236(a) of the INA does not contain a particularly clear and express statement that this Court's jurisdiction to review petitioner's habeas challenges to this mandatory detention has been modified of eliminated. See Demore, 538 U.S at 517ST. Cyr 533 U.S at 298-99, 121 S.Ct. 2271, 150 L. Ed. 2d 347.At no point does this subsection reference petitions for a writ of habeas corpus or 28 U.S.C. 2241. See Felker, 518 U.S. 660-61. Accordingly, as this subsection lacks a clear and express statement of Congress intent either to modify or repeal the jurisdiction of district courts to consider petitioner's claims on habeas, the Court will not finddd that the language "no court may set aside" somehow implies a waiver of jurisdiction under 2241. See Yerger, 8 Wall, at 105 ("Repeals by implication are no favored.").

22

74. Congress enacted the present version of section 236(e), 8 U.S.C. 1226(e), after the Supreme Court's decision in Felker; thus Congress was presumably aware that if it wished to modify or repeal habeas jurisdiction, it must do so explicitly. See, e.g., Cannon v. Univ. of Chicago, 441 U.S. 677, 699, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979) (noting that it is appropriate for courts to presume that Congress was familiar with Supreme Court precedent and "that it expected its enactment[s] to be interpreted in conformity with" such precedent). But as no such explicit statement is present in section 236(e), 3 this Court finds that it retains habeas jurisdiction under 28 U.S.C. 2241 to conasider petitioner's calim.

75. Once the court determine that section 236(e) of the INA does not limit it's jurisdiction to review the merits of petitioner's claim, the Court must turn now to the issue of the temporal reach of section 236(c)'s requirement of mandatory detention for those aliens subject to section 236(c)(1)(B) and (C). Put another way, the question before the Court is whether section 236(c)'s requirement of mandatory detention, which applies "when the alien is released," applies to an alien such as petitioner, who, although charged with removability for conviction of a crime covered by section 237(a)(2)(A)(iii), 8 U.S.C. 1227(a)(2)(A)(iii)(convictin of a aggravated felony), and 237(a)(2)(A)(i), 8 U.S.C. 227(a)(2)(a)(i) conviction of a crime involving moral turpitude committed within an unknown period of years after the unkown date the petitioner entered without inspection after he was encountered in the New York State Criminal Court.

76. The BIA has determined that section 236(c)'s requirement of mandatory detention applies to aliens even if they are not taken into BICE custody immediately upon their release from stae custody. Matterof Rojas, 23 I.& N. Dec. 117, 127 (BIA 20010. Accordingly to the BIA, the clause "when released... is no more a part of the description of an alien who is subject to deterition than are the other concluding clauses[,] ... [which] simply make it plain that the duty to detain is

23

not affected by the character of an alien's release from criminal incarceration or the possibility that an alien may be arrested on criminal charges." Id. at (emphasis in original).

77. Finding that the statute "focused on the removal of criminal aliens in general, not just those coming into [BICE] custody 'when ... released' from criminal incarceration[,]" the BIA held that the language "when released" addressed itself "to the statutory command that the 'Attorney General shall take into custody certain categories of aliens [i.e., those aliens delineated at section 236(c)(1)(A)-(D)], rather than to the descriptions of those categories," Id. at 121, 122. However, it is the federal judiciary, and not the BIA, that has ultimate authority to interpret the reach of section 236(c). See Chevron, U.S.A. Inc. v. Natural Resources Def. Council, Inc., 467 U.S. 837, 843 n.9, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).

78. When reviewing an administrative agency's interpretation of a statute, the Court is to apply well-established cannons of statutory construction. Immigration & Naturalization Serv. V. Cardoza-Fonseca, 480 U.S. 421, 431, 107 S.Ct. 120, 94 L. Ed. 2d 434 (1987). The language of the statute at issue must be given its "ordinary meaning. Id. (citing Immigration & Naturalization Serv. V. Phinpathya, 464 U.S. 183, 189, 104 S. Ct. 594, 78 L. Ed. 2d 401 (1984)).

79. Where the language of the statute is clear, the inquiry is ended, and this Court "must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 843. If the language regarding intent is ambiguous, the Court must defer to the agency's reasonamle interpretation of the statute, however, administrative constructions which are "contrary to clear congressional intent" must be rejected, Id. at n.9

80. **Constitutional of INA 236(c)(1),** 8 U.S.C. 1226(c)Roger Helenese position is that INA 236(c) is facially invalid under the Fifth Amendment Due Process Clause because the statute does not provide any opportunity for the detainee to be released pending a final INS decision on

24

removability. To successfully challenge the facial validity of a statute, Petitioner has demonstrated that "no set of circumstances exist under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 95 L. Ed. 2d 698, 107 S. Ct. 2095 (1987). Further, the facial constitutional of a statute is presumed unless shown otherwise.

81. It is well established that aliens are "subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain" within the borders of the United States. Carlson v. Landon, 342 U.S.524, 531, 96 L. Ed. 547, 72 S. Ct. 525 (1952) (internal citations omitted); see, also, Harisades v. Shaughnessy, 342 U.S. 580, 586-91, 96 L. Ed. 586, 72 S. Ct. 512 (1952); Matthews v. Diaz, 426 U.S. 67, 81, 48 L. Ed. 2d. 478, 96 S. Ct. 1883 (1976); Fiallo v. Bell 430 U.S. 787. 792, 52 L. Ed. 2d 50, 97 S. Ct. 1473 (1977).

82.Congress implementation of it authority to expel aliens must comport with the Constitution, however, Carlson, 342 U.S. at 532-33; INS v. Chadha, 462 U.S. 919, 940-41, 77 L. Ed. 2d 317, 103 S. Ct. 2764 (1983). Resident aliens are entitled to the protections of due process of law in deportation proceedings. See The Japanese Immigrant case, 189 U.S. 86, 100-101, 47 L. Ed 721, 23 S. Ct. 611 (1903); Reno v. Flores, 507 U.S. 292, 306, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993); Landon v. Plasencia, 459 U.S. 21, 33, 103 S. Ct. 321, 74 L. Ed. 2d 21(1982)("once alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.").

83. The Due Process Clause of the Fifth Amendment protects individuals against two types of governmental action. Substantive due process prevents the government from engaging in conduct that "shocks the conscience." Rochin v. California, 342 U.S. 165, 172, 96 L. Ed. 183, 72 S. Ct. 205 (1952), or interferes with rights "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325-26, 62 L. Ed. 288, 58 S. Ct. 149 (1937).

84. The stronger the individual liberty interest, the greater is the level of judicial scrutiny of government action which infringes upon that interest. Procedural due process requires that government action which deprives a person of life, liberty or property be implemented in a fair manner. Mathews v. Eldrige, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976).

85. The substantive due process inquiry begins with a "careful description" of the asserted liberty interest. Reno v. Flores, 507 U.S. at 302. Respondents maintain that the liberty interest implicated by detention under INA 236(c) is the limed interest of a removable criminal alien in release from custody pending a final order of removal, not a generalized interest to be free from physical restraint. Respondents emphasize that a removable criminal alien does not possess the same liberty as a United States citizen charged with s criminal offense who has not yet been found guilty.

86. In Flores, the Supreme Court addressed the constitutionality of a regulation permitting detained juvenile aliens, who were arrested on suspicion of being deportable, to be released only to their parents, legal guardian, close relatives, or to other approved custodians. See 8 C.F.R. 242.24 (1992). If the juvenile is not released to the cusody of an approved custodian, he is placed in a facility that meets "state licensing requirements for the provision of shelter care, foster care, group are and related services to dependent children." 507 U.S.at 298.

87. The Supreme Court found that the liberty interested asserted by the juvenile aliens was not fundamental because a juvenile is "always in some form of custody"; thus, the Court applied a deferential standard of review in determining the constitutionality of the regulation authorizing the detention of juvenile aliens suspected of being deportable. Id. at 302 (internal quotation omitted).

88. The Court determined that the INS regulation, which infringed upon the limited right of juvenile aliens to be free from the custody of a government-operated or government-owned child-care institution where the conditions of such custody are decent and humane, need only the rationally related to the government's legitimate interest in "preserving and promoting the welfare of the child." Id. at 303.

WHEREFORE, petitioner respectfully request that the relief prayed for should be granted together with such other and further relief that this court may deem just and equitable.

Respectfully Submitted

Roger Helenese
Roger Helenese

Dated 06/25/2012

## VERIFICATION

I ROGER HELENESE hereby declare upon penalty of perjury that the statements made in this 28 UCS 2241 petition for a writ of habeas corpus and 28USC 1651 petition for a writ of mandamus and prohibition under the ALL WRIT ACT is true and I hereby also verify that the statements made on belief or information is correct to the best of my knowledge.

Roger Helenese
Roger Helenese

Dated 06/25/2012

27

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————— x

Roger Helenese

Plaintiff,                                    Affirmation of Service

-against-

Eric Holder

_____CV_____ (     )

Defendant.

———————————————— x

I, Roger Helenese , declare under penalty of perjury that I have

served a copy of the attached 28 USC 2241 pettion

upon Clerk united States Distrct court for the Eastern
District of New York
whose address is: 225 Cadman Plz E # 640 Brooklyn
New York, 11201 Eric Holder Jr. United States Attorney
General Department of Justice 950 Pennsylvania ave
Dated: 06-25-2012                          NW Washington, DC 20350
                 , New York

Roger Helenese A#079-107-748
Signature
Buffalo Federal Detention Center
4250 Federal Drive
Address
Batavia, NY. 14020
City, State, Zip Code

Affirmation of Service (USDC-EDNY) - January 2003